UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Sileena Bibb, | ) | CASE NO. 21-cv-2235 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Cuyahoga County Board of | ) | Memorandum of Opinion and Order |
| Developmental Disabilities, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant's Motion for Summary Judgment (Doc. 13). This case asserts violations of the Family Medical Leave Act ("FMLA") and the Families First Coronavirus Response Act ("FFCRA"). For the reasons that follow, the motion is GRANTED to the extent Count Two asserts a claim for denial of leave under the FFCRA and DENIED in all other respects.

**FACTS**

Plaintiff Sileena Bibb brings this action against Defendant Cuyahoga County Board of Developmental Disabilities. Plaintiff worked for the Defendant in various capacities since 2008, initially as a Direct Care Summer Specialist Substitute. Beginning in 2011, she worked as a full-

1

time Adult Program Specialist.  From 2014 to 2019, she worked as a Habilitation Specialist at one of Defendant's Adult Activities Centers, a position which focused on providing direct care to adults with developmental disabilities.  Due to a change in state law, Defendant's direct care adult services programs were discontinued, and Plaintiff was notified that her position would be eliminated.  Staff whose positions were being eliminated were encouraged to seek other job opportunities at Defendant.

Plaintiff applied for and was offered employment as a Developmental Specialist in Defendant's Early Intervention Department in March 2019. The primary function of this position was to "coach, assess, promote, and encourage learning by enhancing routines in partnership with parents/families, and team members that invite play, movement and active exploration in natural environments; [and] assess development in a natural environment." (Doc. 16-19 at 1449).

At all relevant times, Plaintiff's employment was subject to a collective bargaining agreement ("CBA") between Defendant and a union, the Association of Cuyahoga County Employees for Special Students.  Under the CBA, Plaintiff's employment as a Developmental Specialist was subject to a two-year probationary period despite her prior service.

Plaintiff began training for her new position by shadowing her predecessor for about two months in the spring of 2019.  She officially began her employment as a Developmental Specialist on June 10, 2019.  She attended an orientation where she received a handbook detailing job expectations, policies, and procedures.

Two months later, in August of 2019, Defendant appointed Kelly Rainey as Plaintiff's supervisor.  Although she was an experienced Developmental Specialist, this was Rainey's first time serving in a supervisory role in an educational setting.  Under the provisions of the CBA, all

first-year employees received mentorship from an experienced employee. In September of 2019, Developmental Specialist Emily Roll became Plaintiff's mentor.

In May of 2020, Plaintiff requested intermittent FMLA leave to transport her father to medical appointments. This request was approved on June 4, 2020.

Plaintiff testified that during the first fourteen months of her employment as a Developmental Specialist, she had no indication that her performance was not going well. (Doc. 16-1 at 1065). She did not receive any written notification of concerns with her job performance. Rainey shadowed Plaintiff monthly at client visits and offered feedback, including suggestions and strategies. Plaintiff believed that "overall [Rainey] thought that when it came to the rapport of my families I did pretty good." (*Id*.)

However, Rainey testified that at least twice she observed that Plaintiff "was uncomfortable building rapport," and "was struggling to set up appointments for next visits with families." (Doc. 13-6 at 719). When she shadowed employees, Rainey was usually a silent observer, but when she saw Plaintiff struggling, Rainey "jumped in ... and modeled strategies." (*Id*. at 718-19). After the visits, Rainey met with Plaintiff to discuss "what I felt she should improve on and [offer] suggestions on tools and resources that she should tap into for future visits to help build her confidence and her presentation of strategy." (*Id*. at 719-20). In addition, in an email dated July 14, 2020, Rainey asked Plaintiff why her undocumented time for the prior month had been submitted one week late. (Doc. 16-11 at 1462). Another problem Rainey identified was that Plaintiff was "putting her case notes in a non-billable section of [Defendant's] database where it should not be." (Doc. 13-6 at 723). These entries caused billing errors which had significant implications for Defendant, since its billing is pursuant to the Social Security Act

3

and audited by the State of Ohio. During this period, Rainey had bi-monthly meetings with Plaintiff where she offered "suggestions and strategies." (*Id*. at 721).

Roll testified that she also observed Plaintiff on family visits two or three times. Roll characterized Plaintiff's job performance as "similar in terms and at the same level as [her] previous mentees in terms of her professional communication." (Doc. 17-3 at 1566-67). She described Plaintiff as "professional" with the family and "engaged appropriately" with the child during observations. (*Id*.)

On September 16, 2020, Rainey conducted Plaintiff's first annual performance evaluation in the Developmental Specialist position,[1] and rated her "below expectations." Plaintiff had self-reviewed as part of the performance evaluation process, and rated herself "exceeds expectations" in most areas and "meets expectations" in all others. Plaintiff had the right under the CBA to submit written objections to the evaluation, but did not do so.

As required under the CBA, Plaintiff was placed on a Performance Improvement Plan ("PIP").[2] The PIP was developed on September 3, 2020,[3] and signed by Plaintiff on September 16, 2020. Plaintiff acknowledged that the late submission of time pointed out in Rainey's July

---

[1] Plaintiff notes she had met expectations in all her prior performance reviews. These evaluations, however, were for positions with significantly different duties, and the referenced evaluations occurred in 2015, 2016, and 2017.

[2] This document is entitled "Staff Work Plan." However, both parties refer to it as a Performance Improvement Plan.

[3] It is not clear who was involved in drafting the PIP. Defendant states Plaintiff's union representative was "involved in the initial implementation of the plan," but this is not fully supported by the cited testimony. Plaintiff testified that her union representative "initially" had "knowledge of" her PIP. (Doc. 13-2 at 476-77).

14, 2020 email was "the catalyst at saying I'm going on an improvement plan." (Doc. 16-11 at 1462). The PIP had an anticipated end date of November 30, 2020. The stated purpose of the PIP was for Plaintiff to "increase the frequency of visits, complete a more efficient data entry process, improve her spelling and grammar skills, and increase her confidence in her practice and her ability to provide clear strategies to the families on her caseload." (Doc. 13-4 at 660). The PIP initially had five goals:

1. Sileena will work with supervisor to increase the frequency of visits to her current caseload and will implement strategies to increase direct services to individuals such as partnering in evaluations and taking SSP cases.

2. Sileena will work with management to implement a more efficient data entry process which includes entering phone calls and emails in real time, blocking off time for note writing daily, and keeping better track of undocumented time.

3. Sileena will improve her spelling and grammar skills by seeking out strategies such as spell/grammar check on documents before inputting them into the EBEI database, emails, and all other professional documentation.

4. Sileena will work with EI management to identify trainings that will increase her confidence in her practice and ability to provide clear strategies to the families on her caseload and will be able to identify and then demonstrate how she intends to use these in her practice.

5. Weekly check-ins with supervisor to ensure that the work plan is being followed and areas of support needed are being identified quickly.

(Doc. 13-4 at 660).

On September 16, 2020, three additional goals were added to the PIP:

6. Sileena will update her Outlook Calendar every Friday for the following week. She will include details of what she is working on hourly.

7. Sileena will work with EI management to create a predictable schedule that balances virtual and in person visits.

8. Sileena will work in the office 3 days weekly in order for her to get her work done

5

>  more efficiently and in a reasonable timeframe.

(*Id*. at 662-73).

Plaintiff used her previously requested FMLA leave on September 28 and 29, and November 6 and 9, 2020.

Rainey was responsible for overseeing and evaluating Plaintiff's progress under the PIP and met with her weekly. Rainey also added weekly notations to the PIP describing resources she had recommended and actions that Plaintiff was taking which related to the identified goals. For example, Rainey recommended that Plaintiff use Grammarly to proofread her written work, access professional training via YouTube, reach out to peers for support, and request to be added to other Developmental Specialists' cases.

On November 16, 2020, Defendant retrained Plaintiff on the database. Following the re-training, Early Intervention Manager Erin Wladyka emailed Plaintiff stating:

> Thank you for your time today! I hope the re-training on the database was helpful and that you fully understand how to document information and where the information in the database goes.
> Please let me know if you need any further information now or in the future regarding the use of the EBDI database.

(Doc. 16-24 at 1476).

On November 18, 2020, Rainey met with Plaintiff. Following the meeting, at 12:25 p.m., Rainey emailed Plaintiff stating:

Attached is your improvement plan that we reviewed today. We will close out your improvement plan at our next meeting on 11/24/20 @ 9a.m.

(Doc. 15-4 at 911).

Twenty-nine minutes later, Rainey sent another email stating:

6

> I also want to let you know that as we discussed in today's meeting that [sic] your October productivity profile was over 100%, Erin/Sharon and I are reviewing your contacts/and event reports to determine if there are more duplications. I know we discussed this today, and you reached out to Lori for further clarification last week, but I wanted to let you know that we will discuss this at our next improvement plan meeting in further detail. You can also review this in the database to re-check that you did not duplicate your data entry. Thank you.

(*Id.*).[4]

Rainey was questioned at deposition regarding her November 18, 2020 email:

Q: So as of Wednesday, November 18th, 2020, at 12:25 p.m., your intention was to close out Miss Bibb's Performance Plan on 11-24?

A: Yes.

Q: Were you planning on firing her at that point?

A: No. If she did not meet the expectations of the Improvement Plan, I would simply turn it over to HR and they would decide next steps. Would she have probationary failed at that time if I had handed it over to HR? Yes, she would have.

Q: So your decision to extend her Improvement Plan occurred after this email; correct?

A: Yes.

(Doc. 13-6 at 725).

Rainey also testified that at the time she sent Plaintiff the email regarding closing out the PIP, she "was not aware of ongoing concerns in the database," and that these billing issues, which she became aware of less than 30 minutes later, were "the biggest reason why we extended the plan, because she needed more time to improve on her data entry and increasing her visits."

---

[4] Roll testified that these "overlap billing" errors were common and difficult for specialists to correct because the system did not allow them to see all their entries for the month.

(*Id*. at 726, 728).

Approximately one hour after Rainey sent her second email to Plaintiff, Wladyka also emailed Plaintiff regarding data entry:

> I was looking into all of the contacts for October data and came across specific examples of where you are entering duplicate entries into contacts. It was discovered that for the initial evaluations you participated in you had entered a separate contact note.... This is not necessary to do.

(Doc. 16-24 at 1475). She provided further explanation, then concluded:

> Please respond to me by Friday, November 20th if you understand this or you need additional clarification on this or any other database procedures. If I do not hear back from you, I will assume that you fully understand how to document properly.

(*Id*.).

Plaintiff responded "I fully understand and moving forward will not duplicate.... I appreciate the clarification." (*Id*.).

On November 20, 2020, Plaintiff became sick with COVID. Between November 20 and December 16, 2020, Plaintiff was either absent or working intermittent half days remotely due to COVID. Therefore, no meeting was held on November 24, 2020. On November 30, 2020, she again requested FMLA leave to care for her father. This was approved on December 11, 2020. On December 16, 2020, Plaintiff resumed full-time work.

Rainey testified that because Plaintiff "was ill and there were upcoming holidays and she needed more time to improve," the PIP was extended, with a new anticipated end date of January 29, 2021. (Doc. 17-2 at 1556). A note added to the PIP stated that the PIP was extended "due to holiday's [sic] and illness" and would "resume 1/6/21." (Doc. 16-23 at 1463). Rainey testified that she informed Plaintiff of the extension sometime after she returned to work because "[s]he

8

was off sick. I don't reach out to staff when they are off." (*Id*. at 1561).

On January 27, 2021, Rainey emailed Defendant's Chief Human Resources Officer, Christina Brown, regarding Plaintiff's PIP:

> Attached you will find SB's final improvement plan. She has not met 3 goals, partially met 2 goals (made progress), and met 3 goals on this plan over the last four months. I have not sent the finally [sic] copy to SB to ask for her signature yet. Please advise if you would like me to send this draft to her, and what next steps are.

(Doc. 13-5 at 678).

Plaintiff took FMLA leave to care for her father on January 28 and February 1, 2021.

On February 3, 2021, Defendant notified Plaintiff that she failed her probationary period, and her employment was terminated effective February 12, 2021. According to the PIP, she failed to meet goals one, two, and seven, which related to increasing the frequency of her client visits, implementing a more efficient data entry process, and creating a predictable schedule in order to balance in-person and virtual visits.

Rainey testified that she assessed goal one as "not met" because Plaintiff was "supplementing evaluations and shadow visits to meet the expected 70% productivity expectation." (Doc. 13-4 at 664). Rainey determined that Plaintiff failed to meet goal two because she continued to make data-entry errors by recording her time in the wrong section on the database. (*Id*. at 666). Rainey also assessed that Plaintiff did not meet goal seven, which required her "to create a predictable schedule that balances the virtual and in-person visits." (*Id*. at 671).

Following her termination, Plaintiff filed an internal grievance, which was denied. Plaintiff and the union took her case to arbitration. After briefing and a hearing, the arbitrator

9

ruled in favor of Defendant.[5]

Plaintiff thereafter filed this lawsuit. The Amended Complaint contains two claims for relief. Count One is a claim for retaliation under the FMLA. Count Two asserts two FFCRA violations, i.e., denial of leave and retaliation. Defendant moves for summary judgment on both counts, and plaintiff opposes the motion.

**STANDARD OF REVIEW**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

---

[5] Although Defendant asserts that "an arbitrator ... found her FMLA retaliation argument to be 'misplaced'," the cited affidavit is from Defendant's Chief Human Resources Officer. The arbitrator's decision, which is attached to the affidavit, does not address the issues before this Court. The primary issue in arbitration was whether Defendant had violated the CBA by failing to evaluate Plaintiff within her first year of employment. He found that Defendant had properly followed the procedure set forth in the CBA, and had a right to fire Plaintiff without cause because she was a probationary employee.

10

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

## ANALYSIS

Plaintiff asserts retaliation in violation of the FMLA and violation of the FFCRA. Defendant acknowledges that it is subject to both the FMLA and the FFCRA.

### 1. Retaliation in violation of FMLA

In Count One, Plaintiff alleges that Defendant retaliated against her for engaging in FMLA-protected activity. In order to establish a prima facie case of retaliation under the FMLA,

11

a Plaintiff must show that: "(1) [s]he was engaged in a statutorily protected activity; (2) [Defendant] knew that [s]he was exercising [her] FMLA rights; (3) [s]he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger v. Cincinnati Bell Tel. Co.*, LLC, 681 F.3d 274, 283 (6th Cir. 2012) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012)).

Once a plaintiff has established a prima facie case, "the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times." *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 377–78 (6th Cir. 2002) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

If the defendant offers a nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to demonstrate that defendant's asserted reason is pretext. "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "To survive summary judgment, a plaintiff 'must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it' took an adverse employment action against the plaintiff." *Redlin v. Gross Point Pub. School Sys.*, 921 F.3d 599, 612 (6th Cir. 2019) (quoting *Chen*, 580 F.3d at 400). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." *Id.*

12

**(a)     Prima Facie Case**

Defendant does not dispute the first two elements of the prima facie case. Plaintiff both applied for and took FMLA leave, which are statutorily protected activities, and Defendant was aware of these activities.

It is undisputed that Plaintiff's termination qualifies as an adverse employment action. In her complaint, Plaintiff alleges that a number of other events occurring during the tenure of her employment constitute adverse actions. For example, Plaintiff alleges that her negative employment review, placement on the PIP, changes to the PIP, and extension of the PIP are adverse actions. Although the parties spend considerable time in their briefing discussing whether these actions are "adverse," the Court need not address this issue. Simply put, plaintiff's termination alone is sufficient to satisfy this element of plaintiff's prima facie case.

To satisfy the final element, "all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 at 283 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). For the purposes of establishing a causal connection, the Sixth Circuit has made clear that "[o]ur precedents stand for the principle that timing matters." *Seeger*, 681 F.3d at 284 (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) (per curiam)).

Defendant argues that temporal proximity alone is not sufficient to establish a causal connection between Plaintiff's protected activity and her termination. Defendant asserts that, despite the temporal proximity of the events at issue, Plaintiff cannot establish a causal connection because there were legitimate reasons Defendant's actions, the termination process

was in accordance with the CBA, Plaintiff was being given assistance before and during the PIP, and she could have been terminated on the original end date of the plan, had it not been extended.

Upon review, the Court rejects defendant's argument. In the Sixth Circuit, temporal proximity alone may be sufficient to satisfy the casual connection element of a prima facie case. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."). It is undisputed that plaintiff requested FMLA leave on November 30, 2020, which was approved December 11, 2020. On December 16, 2020, Plaintiff was informed of the decision to extend her PIP until January 29, 2021. On January 28 and February 1, 2021, Plaintiff took FMLA leave. On February 3, 2021, Plaintiff was notified she had failed the PIP and would be fired.[6] Because the events happened so close in time, the Court assumes causal connection is satisfied, and Plaintiff has established a prima facie case.

**(b)  Legitimate Reason**

Defendant has provided a legitimate reason for terminating Plaintiff's employment. Defendant asserts that Plaintiff failed her probationary period because she did not meet three of the seven goals in her PIP.

**(c)  Pretext**

Plaintiff argues that Defendant's explanation for her termination was actually a pretext

---

[6]  It appears that the decision to fire Plaintiff was made on or before January 27, 2021, when Rainey emailed Brown informing her that Plaintiff had failed the PIP.

14

for FMLA retaliation for the following reasons.

First, Plaintiff asserts that the extension of the PIP is suspicious. Plaintiff argues that Rainey's November 18, 2020 email to Plaintiff, which indicated that she intended to "close out" the PIP early, i.e., on November 24, 2020, meant that Plaintiff had successfully completed the goals. (Doc. 15-4 at 911). Although further database deficiencies came to Rainey's attention after the November 18 email, Rainey stated in the email that the alleged deficiencies were discussed with Plaintiff at the meeting held earlier that day. (*Id*.). Although additional database issues came to Defendant's attention later that day, Plaintiff was simply notified by email of the discrepancies and was asked whether she understood them. Plaintiff responded that she did understand the issues and would not "duplicate" in the future. This could be interpreted by a trier of fact to mean that the database errors were not significant enough to extend the PIP. It was the extension that ultimately led to Plaintiff's termination. Accordingly, taking the evidence in the light most favorable to the Plaintiff, there is an issue of fact as to whether Defendant had intended to close out the PIP early because Plaintiff had been successful in completing her goals.

Additionally, the PIP indicated that it was extended "due to holiday's [sic] and illness." (Doc. 15-1 at 887). Rainey affirmed this in her deposition testimony. (*Id*. at 891). Yet she also testified that "the biggest reason why we extended the plan, [was] because she needed more time to improve on her data entry and increasing her visits." (*Id*. at 887). Issues of fact exist as to the reasons for the extension of the PIP.

Second, Plaintiff challenges the factual basis for Defendant's assertion that she was terminated because she failed to meet three of the PIP goals. Plaintiff argues that she in fact partially met all three of the goals marked as "not met."

15

Goal one required Plaintiff to "work with [her] supervisor to increase the frequency of visits to her current caseload and ... implement strategies to increase direct services ... such as partnering in evaluations and taking SSP cases."  Plaintiff argues that this is a two-part goal, and there is no dispute that she partnered in evaluations and offered her services on SSP cases. Rainey acknowledged Plaintiff had fulfilled these elements of the goal, and testified she marked the first goal "not met" because Plaintiff was not visiting her caseload "at the frequency that she should have been visiting them.[7]" (Doc. 15-1 at 859-60).  But, the January 20, 2021 note on the PIP states that although Plaintiff scheduled frequent visits, "families often no show or cancel." Therefore, there is an issue of fact as to whether goal one could have been met.

Goal two required Plaintiff to "work with management to implement a more efficient data entry process."  Emails from November 2020 make clear that Plaintiff had made data entry errors the prior month.  Defendant again points to the PIP as evidence that Plaintiff's performance remained deficient in December 2020 and January 2021.  However, the notes relating to this goal seem to indicate improvement.  For example, the PIP states that in December, Plaintiff had "no data entry questions."  On January 20, 2021, Rainey noted "No concerns" with Plaintiff's data entry.  The January 27 note describes a database error that prevented Plaintiff from uploading some documentation, but explains Wladyka identified this as  "a database issue that is being corrected."  Issues of fact remain as to the completion of this goal.[8]

---

[7]   The Court notes that neither the PIP nor the parties' briefing indicates what frequency of visits was sufficient to meet this goal.

[8]   An undated summary in the PIP notes relating to goal two states that Plaintiff continued to make errors in December including "routinely not billing for data entry and prep and paperwork when she is the PSP." (Doc. 13-4 at 665).  However, this is not reflected

16

Goal seven required Plaintiff to "work with EI management to create a predictable schedule that balances virtual and in person visits." It is undisputed that it was not possible to create a schedule "balanced" between in-person and virtual visits in January 2021. The PIP notes state that, in December 2020 and January 2021, Defendant was limiting all employees to "all virtual visits ... no in person visits currently allowed" and concludes "this has balanced itself out currently." Rainey acknowledged that during that period there was "nothing to balance at that point because there were no in-person visits." (Doc. 17-2 at 1552). However, Rainey explained that she marked this goal as "not met" because "[e]ven though we were not doing in-person visits, she could have increased her virtual visits. And that was the expectation." (Doc. 17-2 at 1551). Rainey's PIP note also focused on the *frequency* of Defendant's client visits, which is relevant to PIP goal one, and did not indicate any deficiency in predictability or balance between in-person and virtual visits which are central to this goal.

Plaintiff has introduced sufficient evidence from which a jury could conclude that Defendant's proffered reason for termination is pretext for FMLA retaliation. In particular, issues of fact exist as to the reason for the extension of the PIP which led to Plaintiff's termination, and whether Plaintiff actually failed to meet three of the PIP goals.[9]

For these reasons, summary judgement is denied as to the FMLA retaliation claim.

**2.    Violations of FFCRA**

---

[9] Plaintiff additionally argues that her database entry errors were insufficient to warrant extension of the PIP and her resulting termination because other employees who made similar errors were not terminated. But, Plaintiff fails to demonstrate that these unnamed employees were similarly situated to her.

in the PIP notes from December.

17

As an initial matter, Defendant argues that it provided Plaintiff with all of the leave required under the FFCRA.  Plaintiff does not respond to this argument in any fashion.  Accordingly, the Court finds that Defendant is entitled to summary judgment on Count Two with respect to Plaintiff's claim for denial of leave.  *See, e.g., Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

The Court now turns to Plaintiff's claim of FFCRA retaliation.  Enacted in response to the COVID-19 pandemic, the FFCRA is divided into multiple divisions containing separate provisions. Pub. L. No. 116-127, 134 Stat. 178 (2020).  Section 5104 of the FFCRA prohibits makes it "unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who ... takes leave in accordance with this Act."  FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 195 (March 18, 2020), *see also* 29 U.S.C. §§ 2601, 2620, 29 C.F.R. § 826.150(a).  Under the FFCRA, an employer who discharges, disciplines, or discriminates against an employee for taking protected leave "is considered to have violated section 15(a)(3) of the FLSA." 29 C.F.R. § 826.150(b)(2).  Therefore, other courts have found that FFCRA retaliation claims "may be brought under the FLSA." *Colombe v. SGN*, *Inc.*, 2021 WL 1198304 (E.D. Ky. Mar. 29, 2021) (quoting *Kofler v. Sayde Steeves Cleaning Serv., Inc*., 2020 WL 5016902, at *2 (M.D. Fla. Aug. 25, 2020)).

A prima facie case of retaliation under the FLSA requires that "the plaintiff [ ] prove that (1) she engaged in protected activity under the FLSA; (2) her exercise of this right was known by the employer; (3) the employer took an employment action adverse to her; and (4) there was a

18

causal connection between the protected activity and the adverse employment action." *Pettit v. Steppingstone, Center for the Potentially Gifted*, 429 F. App'x 524, 530 (6th Cir. 2011) (citing *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006)).

Defendant initially argues that Plaintiff is ineligible under the FFCRA because she teleworked. According to Defendant, an employee is not eligible under the FFCRA if the employee is able to telework while under quarantine. Defendant claims that since Plaintiff was not eligible for leave under the FFCRA, she cannot file a claim for FFCRA retaliation. However, Defendant acknowledges that "Plaintiff ... was fully out of work from November 23, 2020 to December 4, 2020." (Doc. 13-1 at 7, n.7). Further, Defendant acknowledges that this absence was due to COVID, making Plaintiff eligible for leave under the FFCRA. Accordingly, Defendant's argument is rejected.

Next, Defendant asserts that Plaintiff failed to make a prima facie case because the extension of the PIP was not an adverse employment action. For the same reasons set forth above, the Court rejects this argument. Termination is indisputably an adverse employment action. Causal connection is sufficiently demonstrated by the temporal proximity between Plaintiff's COVID-related absence, which ended December 16, 2020, and her termination on February 3, 2021. Therefore, Plaintiff has established a prima facie case of FFCRA retaliation.

The Court again finds that Defendant has stated a legitimate, non-discriminatory reason for Plaintiff's termination, i.e., her failure to meet three of the PIP goals.

For the same reasons discussed in relation to Plaintiff's FMLA retaliation claim, the Court finds that there is a genuine issue of material fact regarding whether Defendant's proffered reason for termination is pretext for unlawful retaliation. Issues of fact exist as to whether

Plaintiff in actuality failed to meet the three PIP goals. In addition, reasonable jurors could disagree as to the reasons for the extension of the PIP, which directly led to Plaintiff's termination. In particular, a reasonable juror could conclude that Rainey's testimony that the PIP was extended "due to illness," coupled with her termination shortly thereafter, shows that Defendant terminated Plaintiff because she was out sick with COVID and not for a legitimate business reason.

**CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment is GRANTED to the extent Count Two asserts a claim for denial of leave under the FFCRA and DENIED in all other respects.

IT IS SO ORDERED.

Dated: 11/8/22

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge